IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

STEWART TITLE GUARANTY
COMPANY, a Texas Corporation,       Case No. 6:17-cv-562-ORL-31DCI

    Plaintiff,

v.

MACHADO FAMILY LIMITED
PARTNERSHIP NO. 1, a Florida
Limited Partnership

    Defendant.

_____/

## STEWART TITLE GUARANTY COMPANY'S
## MOTION FOR FINAL SUMMARY JUDGMENT ON ALL COUNTS

Stewart Title Guaranty Company ("STGC"), moves for summary judgment against Machado Family Limited Partnership No. 1 ("Machado") on STGC's declaratory judgment action and Machado's breach of contract counterclaim.   The Court should grant summary judgment because there is no dispute that title curative litigation fully paid for by STGC completely resolved title defect. As a matter of law, that is all that a title insurance policy requires.

## Legal Standard on Summary Judgment

The court should grant summary judgment when the movant shows there is no genuine issue as to any material fact. Fed. R. Civ. P. 56.

> Which facts are material depends on the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991).

> When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the nonmoving party bears the burden of proof at trial, the nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986) (internal quotations and citation omitted). Thereafter, summary judgment is mandated against the nonmoving party who fails to make a showing sufficient to establish a genuine issue of fact for trial. *Id.* at 322, 324-25. The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value").

*Core Construction Svcs. Southeast, Inc. v. Crum & Forster Specialty Ins. Co.*, 2015 WL 8043940 at *3 (M.D. Fla. Dec. 7, 2015) (Presnell, J.) (granting summary judgment), *affirmed at* 658 Fed. Appx. 534 (11th Cir. 2016).

"Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Wright v. Commissioner of Social Sec.*, 2014 WL 982626 (M.D. Fla. March 12, 2014) (Presnell, J.), *quoting Walden v. Schweiker*, 672 F.2d 835, 838–39 (11th Cir.1982) (internal quotations omitted).

When a party gives clear answers to unambiguous deposition questions that negate the existence of any genuine issue of material fact, affidavits or discovery responses that contradict that testimony without explaining the reason for the deposition testimony do not create a fact issue that can defeat a motion for summary judgment. *Van T. Junkins & Assoc., Inc. v. U.S. Industries, Inc.*, 736 F.2d 656, 656 (11th Cir. 1984) (affirming grant of summary judgment); *see also Rivero v. Midtown Towing of Miami, Inc.*, 2014 WL 12531510 (S.D. Fla. Dec. 8, 2014) (crediting deposition testimony and disregarding contradictory affidavits).

113602173.1

"Summary judgment is appropriate in declaratory judgment actions seeking a declaration of coverage when the insurer's duty, if any, rests solely on the applicability of the insurance policy, the construction and effect of which is a matter of law." *Northland Cas. Co. v. HBE Corp.*, 160 F. Supp. 2d 1348 (M.D. Fla. 2001) (Presnell, J.) (granting summary judgment to insurer). The court should accord clear and unambiguous terms of an insurance policy their plain meaning and enforce them as written. *Id.* While ambiguities are construed in favor of the insured, the insured maintain the burden to prove that its claim is covered. *Id.*

### Undisputed Facts

1.      In October 2006, Ruben Joseph O'Berry and Marsha O'Berry ("the O'Berrys") gave a mortgage ("the Mortgage") in the amount of $2,800,000 to Center State Bank ("CSB"). (Answer, Doc. 22 at ¶ 5; Ex. 1).[1]

2.      The Mortgage encumbered roughly 1,300 acres of rural land in Central Florida ("the Property"). (Answer, Doc. 22 at ¶ 6; Counterclaim, Doc. 22 at ¶ 8).

3.      In April 2007, STGC issued a $1,400,000 lenders title insurance policy ("the Policy"). (Answer, Doc. 22 at ¶ 7; Ex. 9).

4.      CSB then assigned the Mortgage to Machado. (Answer, Doc. 22 at ¶ 10).

5.      The Mortgage contains a defective legal description. It misses two calls on that portion of the Property lying in Section 23, causing it not to "close." (Machado Dep. at 102, ln. 5-25).

6.      The O'Berrys defaulted on the loan, and in June 2011, Machado sued to foreclose the Mortgage ("the Foreclosure Action"), and included a count to reform the Mortgage to correct the defective legal description. (Answer, Doc. 22 at ¶ 13; Ex. 12).

---

[1] All "Ex." references are to the single set of continuously numbered deposition exhibits used by both parties.

7.      In July 2012, the O'Berrys' entity (a business partnership with Machado, and the record owner of the Property) filed for bankruptcy.  (Answer, Doc. 22 at ¶ 14).

8.      In November 2012, Machado signed a mediated settlement agreement ("the Settlement Agreement") with the O'Berrys and their entity that resolved all the lawsuits between them, including the Foreclosure Action. (Ex. 13; Machado Dep. at 53, ln. 5-25).

9.      The Settlement Agreement required the O'Berrys to put the Property up for sale for $3 million for six months.  If the O'Berrys were unsuccessful in selling the Property, then the O'Berrys would deed the Property to Machado. (Ex. 13; Machado Dep. at 55, ln. 4-16).

10.     On March 24, 2014, about three years after the Foreclosure Action and over a year after the Settlement Agreement, the lenders first gave STGC notice of a claim under the Policy based on the bad legal description. (Ex. 10; Machado Dep. at 45, ln. 24-46, ln. 7; Stivers Dep. at 88, ln. 22-89, ln. 6).

11.     The claim made no mention of either the Foreclosure Action or the bankruptcy litigation . (Ex. 10).

12.     The claim did not tender any defense of litigation to STGC, nor does it request that STGC retain independent counsel for Machado. (Stivers Dep. at 72, ln. 9-75, ln. 8).

13.     The claim made no mention of the Settlement Agreement. (Machado Dep. at 54, ln. 20-23).

14.     Machado never gave STGC any filing from any litigation describing any claim or defense asserted against Machado. (Machado Dep. at 52, ln. 20-53, ln. 1; Stivers Dep. at 75, ln. 9-77, ln. 3).

15.     STGC's claims handler began assisting Machado by providing a corrected legal description, just as Machado requested. (Counterclaim, Doc. 22 at ¶¶ 31-32).

16.     On July 18, 2014, STGC provided Machado a correct legal description. (Ex. 16; Machado Dep. at 60, ln. 4-62, ln. 7).

17.     The only areas that this description did not cover were partial releases of the Mortgage that Machado had given post-policy, which therefore could not be covered. (Machado Dep. at 113, ln. 4-115, ln. 2).

18.     Machado never responded to STGC's request to tell it whether the legal description it had provided was adequate. (Machado Dep. at 62, ln. 8-63, ln. 1).

19.     The O'Berrys failed to comply with the Settlement Agreement by refusing to give a deed of all the Property to Machado. (Machado Dep. at 58, ln. 11-59, ln. 12).

20.     The O'Berrys took the position that the defects in the legal description, and the language of the Settlement Agreement, meant that they had intended to keep the roughly 160 acres of land in Section 23, because that land had not been encumbered by the Mortgage. *Id.*

21.     Machado and the O'Berrys ultimately tried the issue in the bankruptcy court. (Answer, Doc. 22) at ¶ 22; Machado Dep. at 59, ln. 13-23).

22.     At that trial, Machado called the surveyor who had surveyed the land for the bank when the Mortgage was first given, who testified that his own survey's incorrect legal description had apparently resulted in the defect in the Mortgage. (Ex. 19 at 52-54).

23.     Machado paid for a new survey from this same surveyor, which was introduced in evidence in the bankruptcy court, and which contained a corrected legal description. (Ex. 18; Machado Dep. at 67, ln. 3-14; 68, ln. 10-19).

24.     In September 2015, the bankruptcy court entered its order, flatly rejecting the O'Berrys' position and requiring them to deed the entire Property to Machado. (Ex. 21; Answer, Doc. 22 at ¶ 24; Machado Dep. at 29, ln. 3-14).

113602173.1

25.     In October 2015, the O'Berrys complied with the court's order and gave Machado a deed for the entire Property. (Ex. 22; Answer, Doc. 22 at ¶ 25; Machado Dep. at 29, ln. 4-19; 64, ln. 5-18; 72, ln. 10-25).

26.     The court's order and the resulting deed fully cured the title to the entire Property. (Machado Dep.at 96, ln. 2- 97, ln. 23; 71, ln. 8-73, ln. 3; Stivers Dep. at 44, ln. 13-47, ln. 9; 95, ln. 7-18).

27.     On May 24, 2016, Machado provided its very first quantification of attorneys' fees to STGC, demanding $230,987.06 and counting for fees through mid-2016. (Ex. 25 at 18 (STGC 000224)).

28.     Since the title had been fully cured in October 2015, these fees obviously included Machado's coverage demands under the Policy, which were not covered. (Machado Dep. at 87, ln. 19-88, ln. 19; Stivers Dep. at 125, ln. 7-127, ln. 8).

29.     On September 27, 2016, Machado for the first time quantified the attorneys' fees actually incurred in the curative litigation: $207,243.06. (Ex. 26; Machado Dep. at 84, ln. 1-14).

30.     Within two weeks, STGC paid the entire amount. (Ex. 27; Answer, Doc. 22 at ¶ 36; Machado Dep. at 84, ln. 15-85, ln. 21; Stivers Dep. at 101, ln. 7-21).

31.     Machado provided no underlying billing records to support either fee demand. Answer (Doc. 22) at ¶ 30.

32.     Machado concedes that it never requested counsel other than its own private counsel, who had already been handling the title curative litigation for years. (Machado Dep. at 78, ln. 25-79, ln. 5; Stivers Dep. at 56, ln. 3-7).

33.     Machado was fully satisfied with counsel's performance. (Machado Dep. at 79, ln. 9-25).

34.     Machado contends that the O'Berrys were such obstinate litigants that they would have used any excuse to delay giving up the Property to Machado. (Stivers Dep. at 41, ln. 8-20).

35.     Indeed, Machado concedes that what dragged the curative litigation out, requiring an evidentiary hearing in the bankruptcy court, was that Machado had not insisted on cleaning up the legal description issue explicitly in the Settlement Agreement. (Machado Dep. at 55, ln. 21-56, ln. 25; Stivers Dep. at 88, ln. 22-90, ln. 14).

36.     Machado concedes there was nothing STGC could have done to move the litigation faster. (Stivers Dep. at 97, ln. 17-98, ln. 11).

37.     Machado concedes that the title curative litigation gave Machado all of the Property it contended was encumbered by the Mortgage and covered by the Title Policy. (Machado Dep. at 59, ln. 1-23; 64, ln. 5-18).

38.     Machado concedes that it never requested reimbursement of its attorneys' fees during the title curative litigation. (Machado Dep. at 80, ln. 3-13; Stivers Dep. at 56, ln. 8-18; 102, ln. 6-9).

39.     Indeed, prior to September 2016, Machado had never told STGC what its attorneys' fees for the curative litigation were. (Machado Dep. at 80, ln. 14-17).

40.     Machado never provided STGC a single attorneys' invoice until a week before its deposition in this litigation, and to this day still has not produced all its attorneys' invoices for the curative litigation. (Machado Dep. at 47, ln. 12-25).

41.     Machado's own expert concedes that if Machado wanted reimbursement for fees during the litigation, it would have been reasonable to ask for it. (Stivers Dep. p. 102, ln. 22-

106, ln. 25). He also concedes that it was reasonable for all parties to assume that STGC would pay for the curative litigation, just as STGC did as soon as Machado disclosed what it cost. *Id.*

42.     Machado's expert concedes that title insurers can cover and cure defective legal descriptions by paying an insured's existing counsel a flat fee to handle a reformation count like the one Machado pursued here. (Stivers Dep. at 14, ln. 25-15, ln. 16; 25, ln. 8-13). He himself has never charged more than $35,000 for handling even a complex reformation. (Stivers Dep. at 29, ln. 1-12).

43.     Despite denials in its Answer and response to a request for admission, Machado conceded at deposition that STGC had covered every penny of the fees and costs for the curative litigation. (Machado Dep. at 84, ln. 15-85, ln. 21; 87, ln. 19-88, ln. 19; Stivers Dep. at 48, ln. 6-17; 94, ln. 15-19).

44.     Despite denials in its Answer and response to a request for admission, Machado also conceded at deposition that the curative litigation fully solved the legal description issue. (Machado Dep. at 96, ln. 2-97, ln. 23; 71, ln. 8-73, ln. 3; Stivers Dep. at 44, ln. 13-47, ln. 9; 95, ln. 7-18).

45.     Machado concedes that STGC never denied its title claim, and never suggested that it would not pay for the curative litigation. (Stivers Dep. at 102, ln. 22-102, ln. 1).

46.     Machado's position is that STGC breached the Title Policy by not sending Machado a letter affirmatively saying that it would pay for the curative litigation while it was ongoing, specifically appointing Machado's private counsel to continue pursuing it, and demanding invoices along the way. (Stivers Dep. at 119, ln. 16-122, ln. 20). Yet, Machado cannot point to any difference that such a letter would have made. *Id.*

## Argument

**A.     When title curative litigation resolves a title defect, only the cost of the curative litigation is covered by the title policy.**

When a title insurer pays for litigation that successfully cures a title defect, the title insurance policy limits all liability under the policy to the cost of the curative litigation – no other loss or damages are recoverable under the policy.  *Kahama VI, LLC v. HJH, LLC*, 2016 WL 7104175 at *6 (M.D. Fla. Dec. 6, 2016) ("In Florida, if a final determination by a court cures title defects, the claim is precluded as a matter of law.").

The rule remains the same even if the title insurer never clearly tells the insured that the title insurer is enforcing its option under the policy to cure title for the insured using litigation. *First Federal Savings & Loan Assoc. v. TransAmerica Title Ins. Co.*, 793 F. Supp. 265, 269-70 (D. Colo. 1992), *aff'd* 19 F.3d 528, 531 (10th Cir. 1994).

*Kahama* and *First Federal* are the two persuasive authorities most closely on point, and they should dispose of this case on summary judgment. Both cases derive their rule from the plain language of the policy itself. The Conditions and Stipulations of the policy provide, at Paragraph 4(b), "The Company shall have the right, at its own cost, to institute and prosecute any action or proceeding or to do any other act which in its opinion may be necessary or desirable to establish the title in the estate or interest or the lien of the insured mortgage, as insured, or to prevent or reduce loss or damage to the insured." Ex. 9, p. 4. Paragraph 8(a) then provides that "If the Company establishes the title, or removes the alleged defect, lien or encumbrance…or otherwise establishes the lien of the insured mortgage, all as insured, in a reasonably diligent manner by any method, including litigation and the completion of any appeal therefrom, it shall have fully performed its obligation with respect to that matter and shall not be liable for any loss or damage caused thereby." *Id.* at p. 5.

These provisions reflect the unique nature of title insurance: "A title policy indemnifies rather than guarantees the state of the insured title.  The policy does not guarantee that litigation will not occur, but, in fact, assumes the opposite, that many types of title defect litigation can occur. The insured's claim must await an adverse title determination by a court. 'The claim only lies once a court speaks, and not before, and not if the court's judgment is favorable.'" *Lawyers Title Ins. Co. v. Synergism One Corp.*, 572 So. 2d 517, 518 (Fla. 4th DCA 1990), *quoting* D. Burke, Law on Title Insurance (1986 & 1988 Supp.), section 9.4.3.

Thus, when litigation occurs, the insured wins, the title defect is cured, and the title insurer pays the fees and costs for the successful curative litigation, the title insurer has fully satisfied its obligations under the policy. That is exactly what happened here, in *Kahama*, and in *First Federal*. Machado contends this case is different because it was *Machado*, not *STGC*, that pursued the curative litigation, and because STGC did not clearly tell Machado that STGC intended to pursue the curative litigation using, and paying for, Machado's own counsel. As we will, see, however, these distinctions make no difference under *Kahama* and *First Federal*.

**1.      Under *Kahama*, Machado can make no claim based on delayed acquisition of the Property, even if Machado had not conceded that the litigation could not have been completed more quickly no matter what STGC might have done.**

In *Kahama*, an insured lender's foreclosure action stalled because of an alleged title defect – an adverse ownership interest on a beachfront portion of the property asserted by the county. 2016 WL 7104175 at *1. The title insurer had already retained the property owner's private counsel to litigate to cure that defect, and after the lender made its own title claim, the insurer allowed the existing curative litigation to continue for more than three years. (*Kahama*, Case No. 8:11-cv-02029-JSM-TBM, Doc. 459 at 4-5; Doc. 476 at 6-7, 17). Just as Machado does here, the lender asserted that the title insurer failed to adequately investigate its claim,

failed to adequately communicate its intentions, improperly conducted the curative litigation through the wrong counsel, and took too long to do it. *Id.* The lender claimed that this delay caused a loss because it paid taxes on the property in the interim, and it could not use the property for the development originally intended. *Id.* Eventually, just as happened here, the curative litigation resolved the title dispute in the insureds' favor. 2016 WL 7104175 at *1-3.

The lender sued the title insurer for breach of the policy, alleging, in essence, bad faith in handling the claim. The court entered final summary judgment for the title insurer, because the lender's "title to fee simple in the entire parcel its mortgagor purchased and insured. Under Florida law, Kahama is precluded from now claiming that Old Republic did not diligently defend Kahama in that action." *Id.* at *7. In other words, no matter how long the curative litigation took, and no matter how much the lender disliked the way that litigation was handled, no claim for breach of a title policy lies when curative litigation succeeds in clearing title. *Id.* at * 6, citing *Synergism*, 572 So. 2d at 518; *Cocoa Props., Inc. v. Commonwealth Land Title Ins. Co.*, 590 So 2d 989, 991 (Fla. 2d DCA 1991).

The *Kahama* court acknowledged that cases like *Premier Tierra Holdings, Inc. v. Ticor Title Ins. Co. of Florida, Inc.*, 2011 WL 2313206 (S.D. Tex. 2011), had created confusion about whether such consequential "delay" damages could be recovered if curative litigation was not "diligent." 2016 WL 7104175 at n. 4. *Premier Tierra* is the very case on which Machado relies here. But the *Kahama* court rejected it, concluding that it did not accurately state Florida law. *See generally* Mark A. Brown & Christopher W. Smart, *Are Consequential Damages Recoverable Under a Title Insurance Policy For the Time it Takes to Attempt to Cure a Title Defect*, 86 Fla. B.J. 47 (2012) (discussing the confusion caused by *Premier*, before *Kahama* was decided, and urging the same conclusion *Kahama* eventually reached).

113602173.1

Under *Kahama*, the only relevant facts are that the curative litigation succeeded and the title insurer paid for it. It does not matter that it took a long time. It does not matter if the delay cost the insured lender money. It does not matter if the title insurer did not communicate with the insured lender in the way it wanted, or retain the counsel it wanted, or pursue the curative litigation the way it wanted. It matters only that the title defect was cured, and the policy provides for no covered loss and allows no claim for breach or damages when the title insurer pays for that cure.

Here, of course, even if Florida law allowed a claim for delay damages, summary judgment would still be appropriate, because Machado concedes that the curative litigation was concluded as quickly as it could have been in light of the owner's intransigence, Machado was fully satisfied with its counsel's performance, and nothing STGC could have done would have provided speedier or more complete relief.

2. **Under *First Federal*, Machado can make no claim based on STGC's alleged failure to communicate clearly enough its intentions as to the curative litigation.**

In *First Federal*, an insured lender's foreclosure was delayed, and it was embroiled in "lengthy state court litigation" beginning in 1985, when another creditor of the property owner asserted that the ground lease underlying the owner's interest in the property was void. 793 F. Supp. at 267. It took until 1990 for that litigation to succeed, and vest title to the property in the insured lender via warranty deed. In 1987, the lender had made a claim on its title policy. The title insurer declined to retain new counsel for the lender, and allowed the lender's private counsel to continue handling the litigation. *Id.* at 267-68. The title insurer never formally accepted any tender of defense, never sent a retention letter to the insured's private counsel, and

did not pay a single attorneys' fee invoice until the litigation was finished, when it paid all the fees with a single check.

Just as Machado does here, the *First Federal* lender sued for breach of the policy, seeking consequential delay damages, and asserting that it cured the title defect itself, so the limitation on liability in the policy did not apply. *Id.* at 268-69. After a bench trial, the court rule in favor of the title insurer, holding that the unambiguous language of the policy "plainly prohibits plaintiff's claim if [the title insurer] established title to the property within a reasonable time after it received notice." *Id.* at 269.

Although the case was decided after trial, the *First Federal* court's findings of fact are strikingly similar to the undisputed facts here. It did not matter that the title insurer told the lender that it "would not substitute counsel and [the lender's private counsel] should proceed with the state court litigation." *Id.* at 268. It did not matter that the claim handler "acknowledged that he did not formally tell [the insured that the insurer] was defending." *Id.* Instead, it was merely the claim's handler's "understanding" that the lender's private counsel was pursuing the curative litigation on the title insurer's behalf. *Id.* It did not matter that the lender argued the title insurer "took no action with respect to the defect," and that "it was First Federal's attorneys who established title to the property in the state court proceedings, *not Transamerica*." *Id.* (emphasis in original). All that mattered was that the curative litigation pursued by the lender's private counsel succeeded, and the title insurer thereafter paid the fees and costs for that litigation. *Id.* at 269.

Both *Kahama* and *First Federal* are fully consistent with longstanding title insurance law that allows the title insurer the option to cure title, and limits all liability to the cost of the cure if it is successful. *See, e.g., First Federal Savings Bank of Brunswick v. Stewart Title*

113602173.1

*Guaranty Co.*, 451 S.E.2d 916, 918-20 (S.C. App. 1995) (reversing judgment against title insurer, even though it took no action to cure title until the insureds sued it for coverage), *citing Synergism*, 572 So. 2d at 517.

These holdings also align with all three of the major treatises on title insurance law, which recognize the title insurer's right to elect to cure title, and its absence of further policy liability if the cure is successful. *See* Barlow Burke, *Law of Title Insurance* § 6.16 (2018 ed.); Bushnell Nielsen, *Title and Escrow Claims Guide* § 3.4.5 (2017 ed.) ("No Loss Payable Until Final Determination; No Loss If Title Cleared); Joyce Palomar, *Title Insurance Law* § 11:10 (2017 Ed.);

**B.    STGC did not breach the duty to defend, because Machado never tendered defense of any adverse claim, and curative litigation under Paragraph 4(b) was already pending.**

Machado asserts that STGC breached the duty to defend imposed by Paragraph 4(a) of the Policy's Conditions and Stipulations, which provides:

> *Upon written request by the insured* and subject to the options contained in Section 6 of these Conditions and Stipulations, the Company, at its own cost and without unreasonable delay, shall provide for the defense of an insured in *litigation in which any third party asserts a claim adverse to the title* or interest as insured, but *only as to those stated causes of action alleging a defect*, lien or encumbrance or other matter insured against by this policy. The Company shall have to the right to select counsel of its choice (subject to the right of the insured to object for reasonable cause) to represent the insured *as to those stated causes of action* and shall not be liable for and will not pay the fees of any other counsel. The Company will not pay any fees, costs or expenses incurred by the insured in the defense *of those causes of action* which allege matters not insured against by this policy.

(Ex. 9 at 4) (emphasis added).

This claim fails because Machado never tendered defense of any "claim" or "cause of action," and there was no "defense" to tender, because curative litigation under Paragraph 4(b) was already proceeding.

"All modern ALTA policies require a written tender of defense by the insured to the insurer in order to invoke the duty to defend the insured in litigation…notice short of a tender of defense, has been found not to qualify as a tender." Bushnell Nielsen, *Title and Escrow Claims Guide* § 4.3 (2017 ed.).

Here, Machado has conceded that it never requested that STGC retain counsel to defend it in any litigation. Machado's claim letter makes no reference to any claim or cause of action asserted against Machado by any third party. Nor does the claim letter request that STGC provide a defense. Machado concedes that STGC knew Machado was already represented by counsel, and that it never asked STGC to retain any other counsel for it.

Machado never provided, nor did STGC ever find, any pleading by any third party asserting any cause of action adverse to Machado's title. STGC learned that there had been a foreclosure action *by Machado* that included a count to reform the Mortgage's legal description. But that lawsuit had already been settled by Machado when STGC got its first notice. In addition, Machado never provided and STGC never learned of any pleading responding to Machado's complaint that would have triggered a duty to defend. Even if the owner's had denied Machado's reformation allegations, this would not have been enough to trigger the duty to defend. *See Pioneer Nat. Title Ins. Co. v. Fourth Commerce Props. Corp.*, 487 So. 2d 1051, 1054 (Fla. 1986) ("[T]o hold that a mere denial activates the duty to defend would indeed transform mortgagee title insurance into 'prepaid mortgage foreclosure costs' insurance.  Thus would insurers be forced to underwrite risks not bargained for by either party.").

Indeed, the only action pending by the time STGC got notice was a bankruptcy action that had already concluded with the confirmation of a plan incorporating Machado's own Settlement Agreement. There was no adverse pleading to defend. Instead, the owner had simply refused to voluntarily provide a deed, and Machado later decided to seek affirmative relief through a motion to compel. When it did so, it never requested that STGC intervene to prosecute that motion or defend any claim.

Second, it is clear from a reading of the Policy that tender of defense under Paragraph 4(b) and curative litigation under Paragraph 4(b) two alternative responses to any claim made against title. Here, Machado has conceded that it was fair for both parties to assume that STGC was covering the claim and would pay for Machado's private counsel to cure title. This makes perfect sense, given that Machado's private counsel had been doing just that for years before anyone told STGC about it. In this context, it is meaningless to talk of a duty to defend, when affirmative prosecution of curative litigation is already underway. In other words, this is a "Paragraph 4(b) case," not a "Paragraph 4(a) case."

As such, the Court should follow *Kahama* and *First Federal*, in ruling that STGC complied with Paragraphs 4(b) and 8(a), and has therefore fully complied with its obligations under the Policy.

### Conclusion

**WHEREFORE**, STGC requests an order granting final summary judgment in its favor.


Respectfully submitted,


*/s /Marty Solomon*
Marty Solomon

16

Florida Bar No. 523151
**CARLTON FIELDS JORDEN BURT, P.A.**
P.O. Box 3239
Tampa, Florida 33601-3239
Telephone:  (813) 229-4272
Fax:  (813) 229-4113
Primary email:    msolomon@carltonfields.com
Secondary email:  bbehan@carltonfields.com
                       tpaecf@cfdom.net

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 3, 2018, I filed with CM/ECF and electronically

served the foregoing document on all counsel of record.

*/s/ Marty Solomon*
Attorney

113602173.1